## Panzera et al. v. City of Uniontown

*Wade K. Newell* and *Samuel J. Feigus*, for plaintiffs.

*W. Frank Lane*, for City of Uniontown.

CARR, P. J., July 21, 1951.—The seven plaintiffs, all of whom are engaged as common carriers in operating motor buses transporting passengers for pay on scheduled routes between the City of Uniontown and other communities within the county under certificates of public convenience issued by the Pennsylvania Public Utility Commission, seek to enjoin the city from enforcing an ordinance requiring the payment of an annual license fee for each bus operated, their contentions being that the ordinance violates section 723 of The Vehicle Code of May 1, 1929, P. L. 905, 75 PS §332, and also is discriminatory and unreasonable.

## Findings of Fact

1. On January 23, 1945, defendant, a city of the third class, enacted an ordinance regulating the transportation of passengers for pay by motor vehicles on scheduled service within the city and to points outside the city; restricting the operation of such vehicles in the downtown area to certain designated streets; establishing a city bus terminal; imposing a license fee of $100 a year upon the operator of each bus; and providing a penalty for its violation of not less than $5 nor more than $50. On August 21, 1945, and again on August 16, 1949, the ordinance was amended in some particulars not here material.

2. On December 26, 1944, preceding the enactment of the ordinance, defendant had entered into an agreement with Paul Felty, the owner of a building at the southeastern corner of South Gallatin Avenue and East Church Street in downtown Uniontown, two blocks south of Main Street, to provide therein as a bus terminal a large street-floor waiting room with necessary facilities for the accommodation of incoming and outgoing passengers. The original agreement expired

March 31, 1950, and on that date was renewed and extended for a further period of five years. For this terminal defendant pays Felty $1,500 a year, and there all operators of buses to and from the suburbs of the city are required by the terms of the ordinance to load and unload, being prohibited from taking on or discharging passengers at any other place within the downtown section of the city. In addition to providing the terminal, the city reserves for the use of the buses spaces in front of the terminal that, if metered for parking, would probably yield more than $1,000 a year. It also reserves for the use of the operators of bus lines wholly within the city limits, who are not required to use the terminal, other suitable parking spaces that, if open to the public, would yield at least another $1,000.

3. Since the enactment of the ordinance the total receipts of the city from licenses issued to operators of motor buses have been as follows: 1945 (half-year) $875; 1946, $1,600; 1947, $1,600; 1948, $1,800; 1949, $1,875; 1950, $2,300; 1951, $2,500. Plaintiffs have paid the license fees for 1951 under protest.

4. Plaintiff Joseph C. Panzera owns and operates six buses: two wholly within the corporate limits of the city; one from the city terminal north to Oliver No. 1 and return and thence south to Dutch Hill and return; one from the city terminal north to Bute and return; one from the city terminal south to Collier and return; and one from the city terminal south through Fairchance to the West Virginia line and return. Oliver No. 1 is a mining village on the northern outskirts of the city, and Dutch Hill one of a cluster of residential districts adjoining the city on the south. Bute and Collier, the former five and one-half miles north and the latter seven and one-half miles south of the city, are both mining villages surrounded by rural farming areas. Fairchance is an incorporated

borough seven and one-half miles south of the city. Beyond Fairchance to the West Virginia line 12½ miles farther south, the region is entirely rural. The public utility certificate held by plaintiff for his State line bus does not permit him to transport passengers locally between the City of Uniontown and the northern borough line of Fairchance.

5. Plaintiff F. A. King owns and operates three buses: One from Hopwood west to the city terminal and return; one from Hopwood west to the city terminal, thence north to South Connellsville and return to the city terminal and Hopwood; and one from the city terminal to South Uniontown and return. Hopwood is a village on the National Pike three miles east of the city, in the western foothills of the Allegheny Mountains, separated from the city by farms and open country. South Connellsville is an incorporated borough 13 miles north of Uniontown, on the Youghiogheny River, South Uniontown, though not within the corporate limits of the city, is a residential district on its outskirts. The certificate held by plaintiff for the South Uniontown bus does not permit him to transport passengers locally between the city terminal and certain other points within the city.

6. Plaintiff Paul J. Kennedy owns and operates two buses: One from Republic to the city terminal and return; and one from Tower Hill No. 2 to the city terminal and return. Republic and Tower Hill No. 2 are former mining villages, respectively 10½ and 12½ miles northwest of the city and separated from it by rural areas. The certificate held by plaintiff does not permit him to transport passengers locally between the city terminal and a point approximately one mile west of the city.

7. Plaintiff Pasquale Palumbo owns and operates one bus from the city terminal to Evans Manor and thence to the Connellsville Airport and return. Evans

Manor is a small rural village four miles north of Uniontown in the open country. The airport, seven miles north of the city, is also in the open country.

8. Plaintiff Frank Petro owns and operates one bus from Shoaf and York Run to the city terminal and return. Shoaf and York Run are both mining villages surrounded by rural farming areas, Shoaf being 10½ miles and York Run seven miles south of the city. The certificate held by Petro for this route does not permit him to transport persons locally between the city and York Run Crossroads, approximately six miles south of the city.

9. Plaintiff Herbert Edenfield owns and operates one bus from Rowe's Run, 11½ miles northwest of the city, to the city terminal and return. Rowe's Run is one of several mining villages in that vicinity served by him, all of which are separated from the city by rural farming areas.

10. Plaintiffs Domenick Schiavoni, Paul J. Ferranti, Marco Albertini and John Mocibob, partners, own and operate a number of buses out of Masontown, one of which runs from Masontown through rural farming areas via Balsinger to the city terminal and return. Balsinger is a village six miles distant from the city, between which and the city the certificate held by plaintiffs does not permit them to transport persons locally. Masontown is an incorporated borough 12 miles west of the city.

11. The distances herein stated are the mileages travelled by plaintiffs over the public highways, but all the terminal points mentioned are within a radius of 10 miles of the city.

12. Except as shown in our fourth, fifth, sixth, eighth, and tenth findings, there are no restrictions on the right of any of the plaintiffs to take on or put down passengers at any points between the city and their respective terminals outside the city. All are

engaged in transporting passengers between the city and points within a radius of 10 miles of the city.

### Discussion

The authority of the city to license and regulate the operation of plaintiffs' buses rests upon section 2602 of The Third Class City Law of June 23, 1931, 53 PS §12198-2602, which provides that each city may regulate the transportation by motor vehicles of passengers or property for pay "within the limits of the city, or from points in the city to points beyond the limits of the city," and in such regulation may impose reasonable license fees. In this connection, however, section 723 of The Vehicle Code of May 1, 1929, P. L. 905, 75 PS §332, provides that no city, borough, incorporated town, township, or county shall require or collect any registration or license fee or tax for any motor vehicle, or license from any operator thereof, except that cities may levy a fee or tax upon motor buses and motor omnibuses transporting passengers for pay or hire "within the limits of any city, or from points within such city to its suburbs which are within a radius of ten miles"; and plaintiffs contend that under this statute the ordinance is invalid as attempting to regulate interurban buses which do not transport passengers locally within the city or between the city and its suburbs They argue that the word "suburb" denotes an attached community immediately adjacent to the city, as distinguished from a village or town separated from the city by rural farming areas.

It is true, as we learn from lexicographers, that the word "suburb" was first used to refer to the country lying immediately outside a town or city, more particularly those residential parts of a town or city adjacent to its walls or boundaries; but in modern usage it has come to mean the districts surrounding or encircling a city, its environs, confines, outskirts, periphery, purlieus, including all smaller communities

within its orbit: see Oxford English Dictionary, 1933; Webster's New International Dictionary, 1934. It is, we think, in this broader sense, denoting nearness and not necessarily actual contact, that the word is used in the context of the statute, as the clause "which are within a radius of ten miles" seem to us to signify; and accordingly, we are of the opinion that it was the intention of the legislature to permit cities to regulate commercial transportation by buses to and from all places within that radius.

Neither do we think the ordinance discriminatory or unreasonable. No doubt some buses are operated less profitably than others, or on less profitable routes; but the routes, with such competitive restrictions as exist, were all assigned by the Public Utility Commission upon application of plaintiffs themselves. Obviously the fact that on certain routes particular buses are not permitted to take on or let down passengers within fixed distances from the city does not affect the use they make of the city streets. It is equally clear that the license fee imposed by the city does not constitute a tax, for while it is higher than the average in cities of the third class, it does not exceed or even equal the cost of regulation. It may be that the terminal facilities provided by the city are not entirely satisfactory, either to plaintiffs or the city. There is testimony that the waiting room is not well managed or controlled, and that the parking spaces available for incoming and outgoing buses are not always adequate. These, indeed, appear to be the main causes of plaintiffs' dissatisfaction with the ordinance. Such circumstances, however, are not within our domain. Only by mutual understanding and perhaps mutual concessions in the public interest can difficulties of that nature be avoided. This is not to say that plaintiffs may not, if they so desire, establish and maintain their own off-street terminal.

*Conclusions of Law*

1. The ordinance in suit does not violate The Vehicle Code and is not discriminatory or unreasonable.

2. The ordinance in suit is a valid exercise of the regulatory power granted to the city by The Third Class City Law.

3. Defendant is entitled to have the bill dismissed.

*Decree Nisi*

And now, July 21, 1951, upon consideration of the foregoing case, it is ordered, adjudged, and decreed as follows:

1. That plaintiffs' bill be dismissed.

2. That plaintiffs pay the costs.

The prothonotary is directed to enter this decree nisi and to give notice of its entry to the parties or their counsel of record, and if no exceptions are filed within 10 days after notice, to enter it as the final decree, as of course.